# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ZAINAB BASIR,**

**Plaintiff,**

**v.**  Case No. 18-CV-1136

**MEDICAL COLLEGE OF WISCONSIN,**

**Defendant.**

---

# DECISION AND ORDER

---

Plaintiff Dr. Zainab Basir alleges that her former employer, defendant Medical College of Wisconsin (MCW), discriminated against her on the basis of her Islamic faith and then retaliated against her when she protested the discrimination. MCW has moved for summary judgment on both claims. All parties have consented to the jurisdiction of a magistrate judge.

## 1. Facts

MCW is a private academic institution dedicated to medical education, patient care, research, and community health services. (ECF No. 29, ¶ 1.) Dr. Zainab Basir is a practicing Muslim. (ECF No. 35, ¶ 2.) She began her employment with MCW in 1998 as a full-time faculty member (Assistant Professor) in the Department of Pathology. (ECF No.

29, ¶ 2.) She received an initial three-year appointment on September 1, 1998, and subsequent renewals between 2001 and 2014. (*Id*.) She was promoted to Associate Professor in 2005. (*Id*.) Pursuant to MCW's Faculty Handbook, MCW retained the right to end Dr. Basir's appointment with a one-year notice of non-renewal. (*Id*., ¶ 78.)

The Department of Pathology provides services in anatomic pathology (involving the study of diseased tissues) and clinical pathology (involving the interpretation of a broad spectrum of clinical tests). (ECF No. 29, ¶ 3.) From 2005 until she left MCW on February 28, 2017, Dr. Basir worked in the area of anatomic pathology. (*Id*., ¶ 4.) Her primary duties included patient care; teaching students, residents, and fellows in pathology; and research. (*Id*.)

On July 1, 2007, Saul Suster, M.D., joined MCW and assumed the role of Chair of the Department of Pathology. (ECF No. 29, ¶ 5.) As chair, Dr. Suster was responsible for all the clinical services (i.e., patient care services) provided by the department, the academic activities, the teaching activities, and community engagement. (*Id*., ¶ 6.)

At a faculty meeting on January 7, 2008, Dr. Suster implemented a new patient care delivery model in anatomic pathology, referred to as a "subspecialty sign out." (ECF No. 29, ¶ 7.) At the same time, he articulated his expectations for faculty with respect to clinical service, including (1) each assigned pathologist would be held accountable for the coverage of their respective service and would be expected to be available for duty when assigned; (2) each subspecialty pathologist would be responsible for personally arranging

or securing appropriate coverage in case of an emergency or unexpected absence; and (3) every pathologist was expected to exhibit proper citizenship and collegiality. (*Id.*, ¶ 10.) Dr. Basir says she was not present at this meeting and does not recall receiving any documentation setting forth Dr. Suster's expectations. (*Id.*)

"Despite Dr. Suster's expectation, in practice, some pathologists attended to occasional personal matters off campus for an hour or so as needed carrying a pager." (ECF No. 29, ¶ 17.) However, it was understood within the department during Dr. Suster's chairmanship that, if a faculty member needed or expected to be away from campus for several hours, that pathologist needed to seek prior approval for the absence, either by submitting documentation or directly informing Dr. Suster or department administration of the necessary absence. (*Id.*) According to Dr. Basir, a faculty member did not have to secure coverage for an absence that was unexpected and for not more than a day. (*Id.*)

MCW also has two institution-wide policies related to time off. The first policy, "Attendance (Absenteeism, Tardiness, and Leaving Early)," applies to all MCW employees and states that MCW expects its employees to be at work when scheduled in order to ensure MCW can meet its business needs and missions. (ECF No. 29, ¶ 20.) The policy lists the process to follow if an employee is unable to be present during his or her shift, which includes notifying his/her supervisor and following departmental guidelines. (*Id.*) The second policy, "Paid Time Off," applies to all faculty members and

instructs them to obtain approval from their "leader" or "Department Administrator" for all time off requests in order "to ensure departmental business operations and processes are considered." (*Id*.) Dr. Basir contends that the polices were not enforced in the Department of Pathology. (*Id*.)

In addition to being Chair of the Department of Pathology, Dr. Suster served as Director of Anatomic Pathology and Dr. Basir's direct supervisor from July 2015 to July 1, 2017. (ECF No. 29, ¶ 19.) During his chairmanship, Dr. Suster granted numerous scheduling accommodations to Dr. Basir upon her request when she followed Dr. Suster's clinical service and scheduling policies. (*Id*., ¶ 41.) Dr. Suster shared with Dr. Steven Kroft that Dr. Basir was difficult, unreliable, and not a team player. (*Id*., ¶ 27.)

On August 28, 2014, Dr. Suster received from his brother an unsolicited, inflammatory email about Islam. (ECF No. 29, ¶ 21.) Dr. Suster forwarded the email to another MCW employee, Dr. Jose Plaza, without comment. (ECF No. 35, ¶ 11.) According to Dr. Suster, he forwarded the email to Dr. Plaza to illustrate how his brother had "very different ideas about things" and that his brother "had very strong feelings about people who were different from him." (*Id*., ¶ 12.) Dr. Suster had told Dr. Plaza that his brother is constantly sending him unsolicited emails that criticize or which make fun of minorities, and he told Dr. Plaza that he would send him the next such email that he received from his brother. (*Id*.)

In a letter dated January 14, 2015, Dr. Suster provided Dr. Basir with her 2014 review. The review stated that Dr. Basir "met expectations" for overall performance. In the review Dr. Suster wrote, "You are a highly valued member of our department and we gratefully acknowledge your excellent performance and contributions. On behalf of the college, I congratulate you for your contributions and your progress and wish to continue success." (ECF No. 35, ¶ 3.)

At a June 4, 2015 faculty meeting, which Dr. Basir attended, Dr. Suster issued a strong reminder of his expectations. (ECF No. 29, ¶ 31.) Specifically, Dr. Suster told faculty members that he needed everyone to do extra work, that assignments were made based on availability and compatibility of the assigned faculty for the tasks, that faculty needed to work together, that he did not appreciate tabulating assignments, and that patient care came first and would not be subverted to personal issues. (*Id.*, ¶ 32.) Dr. Suster told Dr. Basir, "[i]f your priorities are different from the College's, you are free to find employment elsewhere." (*Id.*, ¶ 33.)

Eid al-Fitr is a religious holiday celebrated by Muslims marking the end of Ramadan, the Islamic holy month of fasting. (ECF No. 29, ¶ 42.) Eid al-Fitr celebrates the conclusion of dawn to sunset fasting during the month of Ramadan. (*Id.*) The date of Eid al-Fitr tracks the lunar calendar, so the exact day of celebration may change depending on the sighted lunar cycle. (*Id.*, ¶ 52.) When Dr. Basir thought Eid al-Fitr in 2015 was on Saturday, July 18, 2015, she asked Dr. Suster for a change to the weekend call schedule

because of her expected religious observances. (*Id.*, ¶ 54.) On June 16, 2015, a month before Eid al-Fitr, Dr. Suster granted Dr. Basir's request. (*Id.*, ¶ 56.)

Sometime thereafter, Dr. Basir learned that the date of Eid al-Fitr had changed from Saturday, July 18, 2015, to Friday, July 17, 2015. (ECF No. 29, ¶ 57.) Dr. Basir was scheduled to work that morning. (*Id.*) The Islamic Society of Milwaukee, where Dr. Basir attended services, offered a prayer service early in the morning for people who had to go to work. (*Id.*, ¶ 46; *see also* ECF No. 22-1 at 30, 95:12-96-15.) Dr. Basir chose not to attend the early prayer service. (*Id.*, ¶ 47.) She instead attended a 10:30 a.m. prayer service. (ECF No. 29, ¶ 45.) Dr. Basir reported to work at approximately 12:45 p.m. (*Id.*, ¶ 50.) At no time prior to her absence on July 17, 2015, did Dr. Basir inform Dr. Suster of her intended absence that day, or obtain his approval for the absence or secure coverage for the absence in advance. (*Id.*, ¶ 51.)

On the morning of July 17, 2015, Dr. Jess Peterson could not find Dr. Basir when he went to her office to have her review some slides. (ECF No. 29, ¶ 63.) Dr. Basir's assigned medical resident, Mary Beth Borda, told Dr. Peterson that Dr. Basir would not be in that morning because she was celebrating a "fun day" in her religion. (*Id.*, ¶ 64.) Dr. Peterson complained to Dr. Kroft, Vice Chairman of the Pathology Department, of Dr. Basir's absence. (*Id.*, ¶ 67.) Dr. Kroft reported Dr. Peterson's complaint to Dr. Suster. (*Id.*, ¶ 70.) Dr. Suster decided to remove duties for certain tests from Dr. Basir. (*Id.*, ¶ 73.) This decision had no impact on Dr. Basir's pay or faculty rank. (*Id.*, ¶ 74.)

Dr. Basir responded to Dr. Suster's decision with an email that stated, in relevant part: "I almost NEVER leave during the day unless it is a meeting with clinicians in the cancer center or tumor board, etc." She stated, "I DO CARRY A PAGER AND ALWAYS ANSWER IT PROMPTLY IF ANYONE NEEDED TO GET A HOLD OF ME." Further, "I take THE MOST OFFENCE to being accused of leaving early." She concluded with: "I guess in this department you accuse, try and hang the person without a trial." The email made no claim of discrimination based on religion. (ECF No. 29, ¶ 75.)

Following discussions with department leadership, and after consulting with Faculty Affairs, on July 28, 2015, Dr. Suster submitted a recommendation of non-renewal for Dr. Basir to Joseph Kerschner, M.D., Dean of MCW. (ECF No. 29, ¶ 79.) Dr. Suster cited the department's "multitude of personnel issues" with Dr. Basir, including repeated absences from work without first securing coverage, including the July 17, 2015 incident, and evincing "disregard for her patient care responsibilities" and similar instances in the past. (*Id*.; ECF No. 35, ¶ 31.)

On August 4, 2015, Dr. Basir and her attorney contacted MCW in writing, presenting allegations of religious discrimination based on the events of July 17, 2015. (ECF No. 29, ¶ 82.) Dr. Basir met with Dean Kerschner on August 18, 2015. (*Id*., ¶ 83.) Dr. Kerschner told Dr. Basir that he saw the events of July 17, 2015, as a communication issue. (*Id*., ¶ 84.)

On September 25, 2015, MCW presented Dr. Basir with a performance improvement plan (PIP). (ECF No. 29, ¶ 90.) A draft of the PIP contained a provision stating, "Dr. Basir will agree and acknowledge that the Department of Pathology has never discriminated against her on the basis of religion or any other matter." (ECF No. 35, ¶ 28.) However, this provision was removed from the PIP issued to Dr. Basir. (*Id.*)

On October 3, 2015, Dr. Basir filed a complaint with the Wisconsin Equal Rights Division (ERD) and the United States Equal Employment Opportunity Commission (EEOC) alleging religious discrimination and retaliation in relation to the events of July 17, 2015. (ECF No. 29, ¶ 88.)

On October 14, 2015, Dr. Suster sent a letter to Dr. Basir seeking her commitment to the PIP. (ECF No. 29, ¶ 98.) Dr. Basir did not articulate a willingness to adhere to the PIP and never signed the PIP. (*Id.*, ¶¶ 99-100.) Dr. Basir did not comply with the terms of the PIP. (*Id.*, ¶ 101.)

On October 28, 2015, Dr. Basir was assigned to cover an autopsy as the attending physician for a first-year medical resident and the Chief Resident. (ECF No. 29, ¶ 126.) The parties disagree as to whether she fulfilled her obligations, including reviewing the deceased's organs with the trainees. (*Id.*, ¶¶ 130-37.) A January 8, 2016 report from Christopher Hospidales, Manager, Anatomic Pathology from Dynacare Laboratories, concluded that Dr. Basir had failed to supervise her residents during the autopsy and perform the organ review. (*Id.*, ¶ 138.) The report further concluded that Dr. Basir

provided misleading information during the investigation when she stated that she went to the morgue on October 28, 2015. (*Id.*, ¶ 139.)

On February 17, 2016, in accordance with MCW policy, MCW presented Dr. Basir with a notice of non-renewal of her faculty appointment that stated that a lack of general fit in the department was the reason for non-renewal. (ECF No. 29, ¶ 140.)

On April 6, 2016, Dr. Basir filed a second complaint with the ERD and EEOC alleging, among other things, religious discrimination and retaliation for opposing discrimination in the workplace. (ECF No. 29, ¶ 89.)

Dr. Basir's employment with MCW ended on February 28, 2017. (ECF No. 129, ¶ 143.)

## 2. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any materials facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in favor of the non-moving party. *Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 636 (7th Cir. 2019). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of

and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

### 3. Analysis

### 3.1 Religious Discrimination

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual … because of such individual's … religion …." 42 U.S.C. § 2000e-2(a)(1). Courts have historically talked about employees showing illegal discrimination through direct proof or indirect proof and, upon doing so, switch the burden to the employer. *See, e.g., Phelan v. City of Chi.*, 347 F.3d 679, 684 (7th Cir. 2003). However, in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016), the Court of Appeals for the Seventh Circuit emphasized that the legal standard

> is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect."

834 F. 3d at 765. Accordingly, *Ortiz* held that "district courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." *Id*.

Having said that, *Ortiz* stated that it did not concern, let alone purport to do away with, the Supreme Court's burden-shifting framework for showing discrimination set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under *McDonnell Douglas*, the plaintiff presents a "prima facie case of discrimination by showing '(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated employee not in the protected class was treated more favorably.'" *Rozumalski v. W.F. Baird & Assocs.*, No. 18-3586, 2019 U.S. App. LEXIS 25081, at *15 (7th Cir. Aug. 22, 2019) (quoting *Coleman v. Donahue*, 667 F.3d 835, 845 (7th Cir. 2012)). "If the plaintiff establishes a prima facie case, a presumption of discrimination is raised, and the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for its action." *Burks v. Wis. DOT*, 464 F.3d 744, 751 (7th Cir. 2006). *McDonnell Douglas*, 411 U.S. at 802. If the employer proffers a legitimate, nondiscriminatory reason for its action, the burden shifts back to the plaintiff to show that the employer's reason is pretextual. *Rozumalski*, 2019 U.S. App. LEXIS 25081, at *13.

In seeking summary judgment on Dr. Basir's religious discrimination claim, MCW contends that she cannot establish a prima facie case of religious discrimination for two reasons. First, she cannot show that her job performance met MCW's legitimate expectations. Specifically, MCW points to Dr. Basir's "pattern of absenteeism," "disrespect towards colleagues," and "neglect towards patient care" as areas in which

she fell short of MCW's legitimate expectations. Second, Dr. Basir cannot identify a similarly situated, non-Muslim MCW employee who received more favorable treatment than she did. And even if Dr. Basir could establish a prima facie case, she cannot show that MCW's legitimate, non-discriminatory reasons for not renewing her faculty appointment are pretexts for unlawful religious discrimination.

Dr. Basir points to two pieces of evidence that she contends, when viewed together, would permit a reasonable factfinder to conclude that her religion caused her discharge. First, she argues that she was treated less favorably than "a clear, persuasive comparator," Dr. Vinod Shidham. (ECF No. 32 at 16.) Second, she argues that a reasonable finder of fact could conclude that Dr. Suster harbored and acted with anti-Muslim animus" (*Id.* at 9) because he forwarded an email derogatory of Islam.

### 3.1.1 Comparator

MCW does not dispute that Dr. Basir is a member of a protected class. But MCW contends she cannot show that another similarly situated employee not in the protected class was treated more favorably. *See Rozumalski,* No. 18-3586, 2019 U.S. App. LEXIS 25081, at *15; *see also Lewis v. Wilkie*, 909 F.3d 858, 871 (7th Cir. 2018) (noting that, following *Ortiz*, identification of a similarly situated employee remains an element under the *McDonnell Douglas* framework).

"Similarly situated employees must be directly comparable to the plaintiff in all material respects." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012). The

goal of the comparison analysis is to "eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable'—discriminatory animus." *Id*. (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008)).

Dr. Shidham was a member of MCW's faculty in the Department of Pathology, worked directly under Dr. Suster (ECF No. 35, ¶ 18), and, Dr. Basir argues, "was, purportedly, held to the same policies and practices as Dr. Basir" (ECF No. 32 at 16 (Dr. Basir cites "PFOF, ¶¶ 18-25" in support but none actually supports this latter statement)). Dr. Basir asserts that Dr. Shidham "was consistently and repeatedly absent from his clinical service duties." (ECF No. 35, ¶ 19.) When Dr. Suster became aware of the absences, "he simply apprised [sic] him for his behavior." (*Id.*, ¶ 22.) "Dr. Suster did not consider issuing a letter of non-renewal to Dr. Shidham because of his consistent and repeated absences." (*Id.*, ¶ 23.) Nor did Dr. Suster issue a PIP to Dr. Shidham for his absences. (*Id.*, ¶ 24.)

As MCW points out in its reply brief, one fundamental problem with Dr. Basir's identification of Dr. Shidham as a similarly situated employee that was treated more favorably than she was is that she offers no evidence showing that Dr. Shidham is outside of her protected class—that is, she has presented no evidence showing that Dr. Shidham is not a Muslim. She states in a declaration, "I believe I was the only faculty member who was a practicing Muslim in the Department of Pathology." (ECF No. 28, ¶ 2.) But she does

not state the basis for her belief. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). It is difficult to imagine a basis for Dr. Basir's statement that she was the only faculty member in the Department of Pathology who was a practicing Muslim that would not be inadmissible hearsay. Dr. Basir did not offer any testimony from Dr. Shidham or any other evidence establishing that he is not a Muslim. Absent any such evidence, Dr. Basir cannot demonstrate that another similarly situated employee not in the protected class was treated more favorably than she was.

Moreover, Dr. Shidham is not similarly situated to Dr. Basir for a variety of reasons. Perhaps most significantly, when Dr. Shidham was absent from campus, he was still working, albeit from home. Dr. Basir left campus to tend to personal matters. Moreover, Dr. Shidham's absences had been approved by Dr. Suster's predecessor. Soon after Dr. Suster became chairman of the Department of Pathology—that is, around July of 2007, roughly eight years before Dr. Suster became aware of Dr. Basir's attendance problems—he changed the attendance policy of his predecessor and advised Dr. Shidham that he could no longer work from home. (ECF No. 22-3 at 24, 88:15-89:19.) Dr. Basir has presented no evidence that Dr. Shidham continued to be absent from campus after learning that Dr. Suster had changed the attendance policy.

In short, Dr. Shidham's absences did not violate Dr. Suster's attendance and coverage policies because Dr. Suster had not yet announced those policies. In fact, Dr. Suster testified that it was learning of Dr. Shidham's practice of working from home that spurred him to announce his new expectations.

In sum, Dr. Basir has not demonstrated that another similarly situated employee not in the protected class was treated more favorably that she was. Without such evidence, she cannot carry her burden of proving a prima facie case of religious discrimination and her claim fails under the *McDonnell Douglas* burden shifting framework.

### 3.1.2   Animus

Nonetheless, Dr. Basir argues that, under the holistic approach adopted in *Ortiz*, a reasonable finder of fact could conclude that she was terminated due to her religion. Dr. Basir does not argue that Dr. Suster ever exhibited any religious bias towards her. Nor has Dr. Basir presented evidence from others indicating Dr. Suster was biased towards Muslims. Rather, the sole evidence upon which she rests her argument is the fact that Dr. Suster received from his brother an email derogatory of Islam and forwarded it to a colleague.

According to Dr. Basir, "the email in question contained evidence of animus *specifically towards the Muslim religion, Islam, and women's participation therein.*" (*Id*. at 11 (emphasis in original).)  She says that "[t]he link between the subject of the email and the

event that drew Dr. Suster's ire and precipitated the adverse action suffered by Dr. Basir, combined with contradictory explanations which, at best, are open to a variety of interpretations, make the motive and intent evinced by the email a textbook jury question." (*Id.* at 11.)

The email consisted of an article titled "Joys of Muslim Women," purportedly written by Nonie Darwish. (ECF No. 22-6 at 23.) It stated:

> In the Muslim faith a Muslim man can marry a child as young as 1 year old and have sexual intimacy with this child. Consummating the marriage by 9.

> A dowry is given to the family in exchange for the woman (who becomes his slave) and for the purchase of the private parts of the woman, to use her as a toy.

> Even though a woman is abused she cannot obtain a divorce.

> To prove rape, the woman must have (4) male witnesses. Often after a woman has been raped, she is returned to her family and the family must return the dowry. The family has the right to execute her (an honor killing) to restore the honor of the family. Husbands can beat their wives 'at will' and he does not have to say why he has beaten her. The husband is permitted to have (4 wives) and a temporary wife for an hour (prostitute) at his discretion.

> The Sharia Muslim law controls the private as well as the public life of the woman. In the Western World (Canada, Australia, United States and Britain) Muslim men are starting to demand Sharia Law so the wife cannot obtain a divorce and he can have full and complete control of her.

> It is amazing and alarming how many of our sisters and daughters attending American, Canadian, Universities and British Universities are now marrying Muslim men and submitting themselves and their children unsuspectingly to the Sharia law.

By passing this on, enlightened Canadian, Australians, American and British women may avoid becoming a slave under Sharia Law.

(ECF No. 22-6 at 23-25.) The article continued with a brief biography of Nonie Darwish and a summary of her views—specifically, her view that "radical Islamists are working to impose sharia on the world" and warnings of the growing political power of Muslims in Canada, the United States, Australia, and Britain. (*Id.* at 26-30.) The email closed, "This Is your chance to make a difference…! Pass it on to your email list or at least those you think will listen… FOR THIS TO COME TO PASS ALL WE HAVE TO DO IS NOTHING[.]" (*Id.* at 29-30.)

Dr. Suster testified that the email from his brother was unsolicited. Dr. Basir does not point to any evidence suggesting otherwise. The mere fact that Dr. Suster received an unsolicited email from his brother, without more, certainly is not evidence that he harbored any animus towards Muslims. Essentially, the question is whether the fact that Dr. Suster forwarded the email to Dr. Plaza creates a fact question as to whether Dr. Suster shares the views expressed in the email, and, if so, whether that could lead a reasonable finder of fact to conclude that Dr. Suster would not have fired Dr. Basir but for her Islamic faith.

Dr. Suster testified that he previously had told Dr. Plaza that he periodically receives emails from his brother espousing views with which he disagrees. (ECF No. 35, ¶ 12.) He told Dr. Plaza that he would send him the next such email he received to

demonstrate the types of emails he (Dr. Suster) receives from his brother. (*Id.*, ¶ 13.) Dr. Plaza corroborated that testimony and, again, Dr. Basir points to no evidence suggesting that either of them is not telling the truth. Dr. Suster testified that he does not share his brother's views about many things, "including his intolerance towards Islam." (ECF No. 29, ¶ 22.) Dr. Basir cites to no evidence suggesting otherwise.

Nonetheless, Dr. Basir contends that it is up to the jury to decide whether Dr. Suster is telling the truth about the email. While it is certainly up to the jury to resolve questions of credibility, Dr. Basir has not mustered any evidence to put Dr. Suster's credibility in question. Dr. Suster's explanation for his forwarding of the email is not only undisputed by Dr. Basir but it is corroborated by the independent statement of Dr. Plaza.

To the extent that Dr. Basir is arguing that the timing of the email relative to Dr. Suster's decision to discipline her for not showing up to work on the morning of July 17, 2015, suggests that his decision was based on some animus towards Muslims, nothing about the timing is suspicious. The two events were nearly a year apart, separated by a positive performance review of Dr. Basir given by Dr. Suster (ECF No. 35, ¶ 3) as well as by a faculty meeting at which Dr. Suster issued a strong reminder to the attendees, including Dr. Basir, that patient care came first and would not be subverted to personal issues. (ECF No. 29, ¶ 32.)

In short, to create a genuine issue of material fact requires more than simply saying, "the jury may not believe you." And that is essentially all Dr. Basir has. Nothing

from Dr. Suster, Dr. Plaza, or from anyone else suggests that Dr. Suster holds the views expressed in the email. Absent any such evidence, it would be sheer speculation to conclude that the email proves that Dr. Suster harbored any animus towards Muslims.

### 3.2 Retaliation

Title VII prohibits employers from retaliating against employees for complaining about discrimination or engaging in other protected activity. 42 U.S.C. § 2000e-3(a). "To survive summary judgment on [her] Title VII retaliation claim, [the plaintiff] must show that a reasonable jury could find that [s]he engaged in a protected activity, that [s]he suffered an adverse employment action, and that the adverse action was motivated by a protected activity." *Smith v. Ill. DOT*, 936 F.3d 554, 560 (7th Cir. 2019). "A retaliation claim requires proof of causation, which in this context means but-for causation." *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)).

In response to MCW's motion for summary judgment, Dr. Basir attempts to establish a causal connection between her protected activity and her termination by pointing to allegedly suspicious timing and a provision contained in an early draft of the PIP. (ECF No. 32 at 19-21.)

### 3.2.1   Timing

Although it is not clear, the court understands Dr. Basir to be asserting that she complained of religious discrimination two days after her July 17, 2015 absence for Eid

al-Fitr. Dr. Basir argues, "<u>Two days later</u>, Dr. Basir raised concerns of religious discrimination in a conversation with Senior Associate Dean of Faculty Affairs, Dr. Alonzo Walker, who testified that he was 'discomforted' by the conversation. (PFOF, ¶¶ 7-8)." (ECF No. 32 at 19 (emphasis in original).)[1] Adding to the court's confusion is the fact that the proposed findings of fact upon which Dr. Basir relies in support of the prior sentence do not support the sentence—that is, neither Proposed Finding of Fact 7 nor 8 establishes that Dr. Walker was "discomforted" by his conversation with Dr. Basir. Proposed findings of fact not containing the propositions she cites them for is a recurring problem in Dr. Basir's response.

Dr. Basir continues:

Less than 6 weeks later, MCW—through Dean Kerschner and Chairman Suster—was deep into the process of drafting Dr. Basir's PIP. *Id.* Specifically, on September 16, 2015, Dr. Suster replies to a detailed email from Dean Kerschner regarding proposed revisions to the already drafted PIP, thanking him "for all the guidance and recommendations regarding this process." Notably, the drafting of Dr. Basir's PIP began only shortly after her protected activity. There is no evidence in the record of a PIP being considered before August 4, 2015. Even more dubious is the lack of any evidence in the record that Dr. Basir was accused of any performance issues between August 4, 2015 and September 16, 2015.

Thus, a reasonably [sic] trier of fact could readily infer that Dr. Basir's protected activity was the direct cause of the September 25, 2016 PIP issuance. And while the retaliatory PIP itself may not be independently

---

[1] The defendant disputes that "Dr. Walker testified that this conversation occurred on the 'Sunday after the Friday exchange of emails on July 17, 2015,'" (ECF No. 35, ¶ 8) but does not identify when the conversation occurred. For purposes of the present motion, the court accepts that the conversation occurred on July 19, 2015, and that it constituted protected activity.

> actionably [sic] a trier of fact may consider it evidence of retaliatory motive and intent.

(ECF No. 32 at 20.) This suggests that Dr. Basir is arguing that her protected activity led to her PIP. But even if true, that would not support a claim of retaliation because, as even Dr. Basir acknowledges, a PIP is not an adverse employment action under Title VII. *See Fields v. Bd. of Educ.*, 928 F.3d 622, 626 (7th Cir. 2019) (citing *Boss v. Castro*, 816 F.3d 910, 917-18 (7th Cir. 2016)). Given that Dr. Basir acknowledges that a PIP is not an adverse employment action, the only alleged adverse employment action that Dr. Basir identifies in her response to MCW's summary judgment motion is the non-renewal of her contract.

However, Dr. Basir does not attempt to connect her alleged protected activity to the non-renewal of her contract other than to say, "while the retaliatory PIP itself may not be independently actionably [sic] a trier of fact may consider it evidence of retaliatory motive and intent." (ECF No. 32 at 20.)  In other words, she argues that the PIP is evidence that the later decision not to renew her contract was in retaliation for her having complained about religious discrimination. However, to the extent that is the argument she is attempting to make, it is perfunctory and undeveloped and, therefore, forfeited. *See, e.g., Barker v. Quick Test, Inc.*, 2016 U.S. Dist. LEXIS 32755 (N.D. Ill. Mar. 15, 2016) (citing *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010)). Moreover, "suspicious timing alone 'will rarely be sufficient … to create a triable issue.'" *Silk v. Bd. of Trs., Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 710

(7th Cir. 2015) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008)).

And, in any event, a gap of six weeks does not tend to support an inference of causation.

*Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (finding a gap of five weeks to be

an "extended time gap[]" that "militate[s] against allowing an inference of causation

based on suspicious timing"). Consequently, simply because MCW was drafting a PIP

within six weeks of Dr. Basir complaining about religious discrimination does not

support the inference that her protected activity was a but-for cause of MCW's decision

months later, on February 17, 2016 (ECF No. 29, ¶ 140), to tender Dr. Basir with notice

that it would not renew her contract.

### 3.2.2   Draft of PIP

Dr. Basir also argues that language in an early draft of the PIP is "direct, powerful

evidence of retaliatory intent." (ECF No. 32 at 20.) According to Dr. Basir's Proposed

Finding of Fact No. 28, a draft of the PIP included the following provision, "Dr. Basir will

agree and acknowledge that the Department of Pathology has never discriminated

against her on the basis of religion or any other matter." (ECF No. 35, ¶ 28.)

However, identifying the evidentiary basis for Proposed Finding of Fact No. 28 is

a challenge. Dr. Basir supports this proposed finding of fact with an "*Id.*" (ECF No. 35,

¶ 28.) Proposed Finding of Fact No. 27, to which the "*Id.*" presumably refers, is supported

by the following citation, "Supp Flanner Decl. Exhibit P; Suster Exh 15." "Supp Flanner

Decl. Exhibit P" appears to correspond to ECF No. 30-2, which is the email Dr. Suster

received from his brother and, thus, not relevant to Proposed Finding of Fact No. 28. "Suster Exh 15" appears to correspond to ECF No. 30-1, which Dr. Basir docketed under the title, "Exhibit O Suster's Dep Exhs 15, 20 (PIP)." This is a nine-page document consisting of various emails, the letter informing Dr. Basir that her contract will not be renewed, and a 2014 performance evaluation—that is, it appears to be three separate deposition exhibits. (ECF No. 30-1.) Dr. Basir did not identify any particular page from ECF No. 30-1 as supporting Proposed Finding of Fact No. 28.

The first four pages of ECF No. 30-1 appear to have been labeled "Exhibit 15" at Dr. Suster's deposition. The first three pages are comprised largely of an email from MCW Dean Kerschner to Dr. Suster wherein Dean Kerschner offers comments on a draft PIP submitted to him by Dr. Suster. One comment is:

> Please check with Legal on #6 – it might be important to include this – just not sure.
>
> 6. Dr. Basir will agree and acknowledge that the Department of Pathology has never discriminated against her on the basis of religion or any other matter.

(ECF No. 30-1 at 2.) Dr. Basir argues:

> Despite being included by Drs. Hill and Suster in a document they labeled a PIP, the above provision clearly does not relate to Dr. Basir's performance. Rather, a reasonable trier of fact could easily infer that the above provision is an express reference to Dr. Basir's concerns regarding religious discrimination and retaliatory attempt to prevent her from repeating these concerns. …

(ECF No. 32 at 20-21.)

The court agrees that a waiver of a discrimination claim is irrelevant to a PIP. And if a waiver of a claim of discrimination is included in a PIP, it might support the inference that the PIP was a pretext to get the employee to waive any discrimination claim she might have. In such circumstances, depending on the facts, it might be possible for a jury to conclude that, but for the complaint of discrimination, the employer would not have implemented the PIP. However, that would not amount to unlawful retaliation because, again, a PIP by itself is not an adverse employment action.

Moreover, any attempt to show a causal connection between protected activity and the PIP fails because the waiver provision was not included in the PIP presented to Dr. Basir. The fact that it was removed before the PIP was given to Dr. Basir undermines any suggestion that her complaint of discrimination was the but-for cause of the PIP.

More importantly, Dr. Basir fails to connect the inclusion of a waiver provision in a draft of the PIP with the complained-of adverse employment action—that is, the non-renewal of her contract. To survive summary judgment, Dr. Basir must show that the waiver provision suggests that, but for her complaint of religious discrimination, MCW would have renewed her contract. Dr. Basir does not articulate a basis for any such conclusion and the court can discern none.

Finally, even considering the evidence as a whole, and specifically the waiver provision in an un-tendered draft of the PIP and the purported temporal proximity to her protected activity that are the focus of Dr. Basir's response, the court finds that no

reasonable finder of fact could conclude that, but for Dr. Basir's protected activity, MCW would have renewed her contract.

**IT IS THEREFORE ORDERED** that the Medical College of Wisconsin's Motion for Summary Judgment (ECF No. 16) is **GRANTED**. Zainab Basir's complaint and this action are dismissed. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 28th day of January, 2020.

WILLIAM E. DUFFIN
U.S. Magistrate Judge